LEMUEL T. DOWNING *et al.*, plaintiffs in error, *vs.* JOHN PEABODY, administrator, defendant in error.

1. A private contract made with a guardian for the purchase of the ward's land for a stipulated price, at a future public sale, under a proper leave from the ordinary, is contrary to public policy : Code, sections 1828, 2566; *9 Georgia Reports, 114; 22 Ibid., 637; 46 Ibid., 34.*

2. Money advanced to a guardian upon such a contract, in anticipation of a sale which he did not live to consummate, cannot, as against the ward, be treated as a payment to a succeeding guardian, on a legal public sale of the land made by the latter to the same persons who advanced the money, even though by agreement between the second guardian and the purchasers when the deed was made, the advance to the former guardian was considered equivalent to cash, and as present payment.

3. In the application of the foregoing principles, it makes no difference that the second guardian was surety on the guardianship bond of the first, and was also his business partner; that the money advanced came in to the partnership business so as to create a debt for it against the firm, which debt survived against the second guardian as surviving copartner, and that the firm assets came into his possession, and were in his possession, when, as guardian, he sold and conveyed the ward's land.

4. The ward having died, his administrator is entitled to maintain a bill in equity against the second guardian and the purchasers, to compel actual payment of the purchase money thus left unpaid, the purchasers still retaining the land and making no claim to rescind the contract of purchase.

Guardian and ward. Contracts. Before Judge UNDERWOOD. Muscogee Superior Court. May Term, 1875.

Upon the trial, the court charged the jury, amongst other things, as follows :

"That neither the case made by the complainant, nor that made by the defendants, raised the question whether the pri-

vate agreement for a sale, made by King, was binding and valid against the guardian, McKendree."

"That a payment in advance to King, as guardian, upon a sale of property of the ward, to be afterwards made by King, as guardian, is not a payment to McKendree, as guardian, upon a sale made by McKendree, as guardian, afterwards, and after the death of King. That the purchasers at the sale made by McKendree, as guardian, if put in possession of the property under and from McKendree, as guardian, will be bound to respond for the unpaid purchase money except in so far as the guardian has properly paid money to and for the use of the ward."

To this charge the defendants excepted. The jury found for the complainant. Defendants assign error upon the above ground of exception.

For the remaining facts see the opinion.

H. L. Benning; L. T. Downing, for plaintiffs in error.

Peabody & Brannon, for defendant.

Bleckley, Judge.

King was the guardian of a minor who owned certain real estate. He agreed privately with Downing and Peterson for the sale of it, at a stipulated price, $945 00. In order to make a legal title it was understood that leave was to be obtained from the ordinary, and the sale was to be 'advertised and made publicly, according to law. After obtaining leave from the ordinary, King advertised the sale, and while the advertisement was running, called upon Downing to advance $800 00, of the agreed price. Downing made the advance, and King died before the property was brought to sale. McKendree then obtained letters of guardianship, advertised the property, and sold it legally. Downing and Patterson became the purchasers at the same price which had originally been agreed upon with King. When the deed was made by McKendree, they insisted that the advance of $800 00 to King should be treated as a payment of that much of the

purchase money, to which McKendree assented, executing the deed upon the payment to him of the balance, $145 00   The ward died, and Peabody administered upon his estate; after which, as such administrator, he filed this bill against McKendree, Downing and Patterson, to recover the $800 00 as unpaid purchase money.

1. The private contract with King was contrary to public policy.    Although, according to the evidence, the price agreed upon was not only fair, but in excess of the value of the property, still, the rule of law was violated.   See the cases cited in the syllabus.

2. Independently of the question of public policy, we think the advance to King cannot be treated as payment.   The purchasers contend that the office of guardian is the same office though incumbents change, and that a successor in the trust is bound by the acts of his predecessor.   This is doubtless true for many purposes; as, for instance, if the first guardian had completed the sale, making it in all respects legal, and had received a part of the purchase money, leaving the deed unexecuted and the balance of purchase money unpaid, the successor, upon receiving such balance, might be compelled to execute title, the same as if the sale had been his own and he had received all the purchase money.   In such a transaction the guardianship-trust would have been properly represented, as to part of it, by one guardian, and, as to part, by another.    But that is not the case before us.   As to the money advanced to King, that did not become the ward's money; it did not pass under the protection of the guardian's bond; in spite of the illegal agreement concerning it, it was simply an advance to King as an individual; the ward's title to his property had not been divested; and the ward could not be owner of both the property and the money.   The receipt of the money was not a representative act; it was not an act for which the law provides; it was not an act for which King, as guardian, was responsible; it was not an act, which, as against the ward, can be made available for any purpose in favor of those who participated in it.

3. McKendree was King's surety on the guardianship bond; and was also his partner in business, under the firm name of McKendree & King. The $800 00 advanced to King was brought, it seems, by him into the partnership business; and, on his death, the firm assets remained in McKendree's possession as surviving partner. He, doubtless, had this possession when, as guardian, he sold and conveyed the ward's property. We do not think these facts make any difference. Giving them the fullest possible effect, they would amount simply to this, that the $800 00 constituted a debt against McKendree as surviving copartner, and that he had assets of the firm, a part of which were the proceeds of this identical fund, or perhaps the fund itself. He could not use his ward's property to pay either a partnership debt or his own individual debt; and there is no pretext that, as guardian, he purchased any portion of the partnership effects, or took any steps to substitute them in place of the ward's property, even if it would have been competent for him to do so.

4. The ward having died, his administrator is entitled to compel payment of the unpaid purchase money, and for that purpose this bill, we think, was proper. It alleges the insolvency of McKendree and that is admitted. But even if he were not insolvent, he has failed in his duty in not making a collection, and for that reason might very well be made jointly liable with the purchasers from whom he ought to have collected. It is more equitable that the defendants in this bill should respond to the administrator than that McKendree's surety should do so. The purchasers retain the land without having legally paid for it, in full; and they make no claim to rescind the contract of purchase for fraud or any other reason. The decree rendered against the defendants was altogether as low as it could have been made. They were allowed credit, not only for all amounts that went to the ward's benefit from either guardian, but for a small excess on their bid over the real value of the property. The allowance of this excess was by consent, and was, we think, liberal and proper.

Judgment affirmed.